[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11271

_____

KEITH EDMUND GAVIN,

Petitioner-Appellee,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:16-cv-00273-KOB

_____

Before JORDAN, BRANCH, and LUCK, Circuit Judges.

BRANCH, Circuit Judge:

Keith Gavin is an Alabama prisoner serving two death sentences and a term of life imprisonment following his 1999 jury convictions on two counts of capital murder and one count of attempted murder. After pursuing a direct appeal and postconviction relief in the Alabama state courts, Gavin filed a federal habeas petition under 28 U.S.C. § 2254, alleging, in relevant part, that his counsel rendered constitutionally ineffective assistance during the penalty phase and that the jurors engaged in premature deliberations before the penalty phase in violation of his constitutional right to a fair trial. The district court denied relief on Gavin's juror misconduct claim, but it concluded that the state court's determination that counsel was not ineffective was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, the district court conditionally granted Gavin habeas relief on his ineffective-assistance claim, unless Alabama initiated new sentencing proceedings within 90 days of the order.

The Commissioner of the Alabama Department of Corrections ("Alabama") appeals the grant of habeas relief. Gavin cross-appeals, arguing that the district court correctly granted habeas relief on his ineffective-assistance claim. In the alternative, he argues that habeas relief is warranted on his juror misconduct claim. After review and with the benefit of oral argument, we reverse the district court's decision granting habeas relief on

Gavin's ineffective-assistance claim because the state court's determination that counsel was not ineffective during the penalty phase was not contrary to, or based on an unreasonable application of, *Strickland*. As for Gavin's cross-appeal, we affirm the denial of habeas relief for the juror misconduct claim.

## I.    Background

### A. The Guilt Phase of Trial

In 1998, an Alabama grand jury indicted Gavin on two counts of capital murder in connection with the murder of William Clayton, Jr., and one count of attempted murder in connection with shooting at a law enforcement officer. *Gavin v. State*, 891 So. 2d 907, 926 (Ala. Ct. Crim. App. 2003). The murder of Clayton constituted two capital counts because (1) it was committed during the course of a robbery in the first degree, and (2) Gavin had been convicted of another murder within the previous 20 years.[1] See Ala. Code § 13A-5-40(a)(2), (13) (1975). Attorneys H. Bayne Smith and John H. Ufford, II, were appointed to represent Gavin at trial.

At Gavin's November 1999 trial, the evidence established that the victim, Clayton, was a courier driver for Corporate Express Delivery Systems, Inc. *Gavin*, 891 So. 2d at 927. On the evening of March 6, 1998, after completing his deliveries, Clayton stopped

---

[1] In 1982, Gavin was convicted of murder in Illinois and served 17 years of a 34-year sentence. *Gavin*, 891 So. 2d at 930. Gavin was on parole for the 1982 murder at the time of the Alabama murder. *Id.*

4                    Opinion of the Court                    20-11271

at a Regions Bank to use an ATM. *Id.* Eyewitnesses, including Gavin's cousin, Dewayne Meeks,[2] testified that Gavin approached Clayton's van parked outside the bank, shot Clayton, got into the van, and then drove off. *Id.*

An investigator with the local district attorney's office heard about the shooting over the radio and witnessed the van matching the description pass him. *Id.* at 928. He pursued the van. *Id.* When he turned on his emergency lights, the van stopped in the middle of the road, the driver got out, turned toward the investigator, and began shooting before running off into the woods. *Id.* The investigator discovered Clayton in the van, barely alive, and called

---

[2] Meeks was also indicted for capital murder, but the charge was later dismissed. *Gavin*, 891 So. 2d at 928. At Gavin's trial, Meeks testified that he, his wife, their children, and Gavin drove from Meeks's home in Chicago to Chattanooga, Tennessee, so that Gavin could meet up with a woman that he had met a month earlier in Alabama. *Id.* at 927. When the woman did not show up at the arranged meeting place, Gavin asked Meeks to drive him to Alabama in hopes of locating the woman. *Id.* Gavin and Meeks were stopped at an intersection in Centre, Alabama, when Gavin exited Meeks's vehicle and approached Clayton's van in the bank parking lot. *Id.* at 928. Meeks thought that Gavin planned to ask Clayton for directions, but he witnessed Gavin shoot Clayton. *Id.* Meeks fled the scene, returned to the motel, and he and his family immediately left for Chicago. *Id.* Meeks was employed by the Illinois Department of Corrections and, upon his return to Chicago, he discovered his department issued gun was missing. *Id.* Meeks suspected that his gun was the gun Gavin used to kill Clayton. *Id.* Meeks reported the gun missing, but he did not mention that it might have been used in a crime. *Id.* After discussing the incident with several friends, Meeks later contacted Alabama law enforcement to report what he knew about Gavin's crime. *Id.*

20-11271                Opinion of the Court                5

for an ambulance, but Clayton was pronounced dead upon arrival at the hospital. *Id.* at 929. The investigator identified Gavin as the person who shot at him. *Id.*

Within minutes of the investigator's encounter with Gavin, other law enforcement officers arrived on the scene and searched the woods. *Id.* Gavin was discovered in the woods and attempted to flee, but he stopped when an officer fired a warning shot. *Id.* Without prompting from the officers, Gavin stated, "I hadn't shot anybody and I don't have a gun." *Id.* The gun was found several days later near the woods, and ballistics confirmed that bullets found in the victim and the van had been fired from the gun. *Id.* at 930. The jury found Gavin guilty on all counts.

## B. The Penalty Phase

At the penalty phase before the jury,[3] the State offered three aggravating circumstances: (1) that Gavin was previously

---

[3] In Alabama, the trial court must conduct a separate sentencing hearing "as soon as practicable after the defendant is convicted" to determine whether the defendant should be sentenced to life imprisonment without parole or to death. Ala. Code § 13A-5-45(a). During the sentencing hearing, the parties may present evidence of the existence of any aggravating or mitigating circumstances. *Id.* § 13A-5-45(c). Under Alabama law at the time of Gavin's trial, if the jury determined that one or more aggravating circumstances existed but that they did not outweigh the mitigating circumstances, it was to return an advisory verdict recommending life imprisonment without parole. *Id.* § 13A-5-46(e)(2) (1999). But if the jury determined that one or more aggravating circumstances outweighed the mitigating circumstances, it was to return an advisory verdict recommending a death sentence. *Id.* § 13A-5-

convicted of another felony involving the use or threat of violence to a person (his prior Illinois murder conviction); (2) that Gavin committed the murder during the commission of a robbery; and (3) that he committed the murder while under a sentence of imprisonment for another crime.[4]   In support, the State called

---

46(e)(3).  A death penalty recommendation required a vote of at least 10 of the 12 jurors.  *Id.* § 13A-5-46(f).

[4] At the time of Gavin's sentencing, the following constituted statutory aggravating circumstances in Alabama:

> (1) The capital offense was committed by a person under sentence of imprisonment;
>
> (2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person;
>
> (3) The defendant knowingly created a great risk of death to many persons;
>
> (4) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping;
>
> (5) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
>
> (6) The capital offense was committed for pecuniary gain;
>
> (7) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or

Gavin's parole officer as a witness, who testified that Gavin was released from prison for his 1982 Illinois murder conviction at the end of December 1997 and was on parole when he murdered Clayton.

Gavin called two witnesses during the penalty phase—minister S.J. Johnson and Gavin's mother.[5]

Johnson testified that he met Gavin approximately 20 months earlier, shortly after Gavin was arrested and requested that someone from the church come and speak with him. Johnson had visited Gavin weekly for about an hour each time for the past 20 months. Johnson explained that, initially, Gavin had "an attitude that he was blaming everybody except [himself]" for his circumstances and things that had happened. But as time went on, Gavin "stopped blaming others so much and he began to see where he should take some responsibility." In Johnson's opinion, Gavin now accepted responsibility for his actions, had shown a desire "to do God's will," and "was sincerely trying to make changes in his life." Johnson expressed that if Gavin were given life imprisonment instead of a death sentence, Gavin had "the potential to cultivate a deeper relationship with God and [Johnson] fe[lt] that there [was] hope for [Gavin] if he's given time and opportunity." Johnson

---

(8) The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.

Ala. Code § 13A-5-49 (1999).

[5] Counsel Smith handled the questioning of these witnesses.

pleaded for the jury to show Gavin mercy.[6] Finally, Johnson expressed his sympathy to Clayton's family for their loss.

Gavin's mother, Annette, testified that Gavin was the second of eleven living children. She was a Jehovah's witness, and she raised Gavin with a religious foundation. She stated that Gavin was always concerned about other people and concerned with "what was fair." And that "[h]e loves justice, he really does." She pleaded for mercy, asking the jury to spare Gavin's life, explaining that

> I really feel . . . that knowing how he views things, that he really has the ability to live as he should live because he has taken up that course, you know, because he had to, he had to see it, he sees it now. And so if he's given the opportunity, he could help others. He could really be a great source of help to others and to our Creator.

In closing argument, the State emphasized the details of the 1982 Illinois murder and that Gavin showed no mercy then or when he committed the Alabama murder. The State maintained

---

[6] In asking for mercy, Johnson relied on the Bible, reminding the jury that, although the Old Testament stated, "an eye for an eye, tooth for a tooth, soul for a soul," there were many more examples of God's mercy in the Bible. Johnson also pointed out that "[w]e no longer live under the scriptures of the Old Testament," that "Christ's example was the law of love and mercy," and that "as Christians we live under the law of Christ."

20-11271                Opinion of the Court                9

that the death penalty was the appropriate sentence for Gavin's actions.

Gavin's counsel argued that the two murders, although terrible and unforgiveable, did "not represent the sum total of Keith Gavin's life nor even the majority of it. They represent just what they are. A few brief moments of anger that were expressed in a terrible way." He urged the jury to consider Gavin's family and the fact that his family still supported him during the trial, and that Gavin requested to speak with a religious advisor after he was arrested—factors which pointed to redeeming qualities in Gavin. He then emphasized that death is irrevocable and urged the jury to grant Gavin mercy.

Following deliberations, the jury returned a non-binding 10 to 2 advisory verdict, recommending the death penalty for the two capital counts.[7]  *Gavin*, 891 So. 2d at 926–27.

---

[7] At the time of Gavin's trial, the jury's sentencing recommendation was non-binding on the trial court, but the trial court was required to "consider" the recommendation when determining the appropriate sentence. *See* Ala. Code § 13A-5-47(e) (1999). In other words, Alabama vested "ultimate sentencing authority" in the trial judge, provided the trial judge considered the jury's recommendation. *Harris v. Alabama*, 513 U.S. 504, 508–09 (1995). Alabama's sentencing scheme did not specify the weight the trial judge should give the jury's recommendation. *Id.*

In 2017, Alabama amended its statutes to make the jury's verdict binding. *See* Ala. Code § 13A-5-46(e) (2018); *see also Keaton v. State*, case no. CR-14-1570, __ So. 3d__, 2021 WL 5984951, at *6 n.2 (Ala. Ct. Crim. App. 2021) ("Effective April 11, 2017, §§ 13A-5-46 and -47, Ala. Code 1975, were

At the separate sentencing hearing, the trial judge found the three aggravating circumstances proffered by the State: (1) that the murder was committed while Gavin was under a sentence of imprisonment; (2) that Gavin was previously convicted of another felony involving the use of violence to the person—the 1982 Illinois murder; and (3) that "the capital offense was committed while the defendant was engaged in the commission of or attempt to commit robbery." The court found that no statutory mitigating

---

amended by Act No. 2017-131, Alabama Acts 2017, to provide that the jury's sentencing verdict in a capital-murder trial is no longer a recommendation but, instead, is binding upon the trial court.").

circumstances existed.[8]  As for non-statutory mitigation,[9] the trial

---

[8] At the time of Gavin's sentencing, statutory mitigating circumstances in Alabama were as follows:

> (1) The defendant has no significant history of prior criminal activity;

> (2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

> (3) The victim was a participant in the defendant's conduct or consented to it;

> (4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;

> (5) The defendant acted under extreme duress or under the substantial domination of another person;

> (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and

> (7) The age of the defendant at the time of the crime.

Ala. Code § 13A-5-51 (1999).

[9] Under Alabama law, non-statutory mitigating circumstances

> shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment with parole instead of death.

Ala. Code § 13A-5-52.

court noted that it had considered sentencing consultant John David Sturman's memorandum on behalf of Gavin.[10]  The trial court explained that:

> In that memorandum, the defendant's mother is reported to have described the defendant's life as influenced by or subject to a combination of drugs and gang violence while living in a Chicago housing project.  The defendant's mother also testified at the sentence hearing conducted before the jury.  The defendant's attorney has advised the Court, however, that the defendant denies ever having a drug problem.  At the sentence hearing conducted before the jury, the Court heard testimony of Reverend [S].J. Johnson who spoke eloquently on behalf of the defendant as a result of his frequent meetings with the defendant over the many months of the defendant's incarceration.  Reverend Johnson opines that the defendant has concern and sympathy for the victim's family, and that the defendant is capable of a closer relationship with God.  This Court has considered all matters presented by the defendant, but this Court

---

[10] Sturman's memorandum stated that Gavin spent the majority of his childhood in the housing projects of Chicago.  Many of Gavin's siblings had drug problems, and some had been arrested or incarcerated for unspecified crimes.  Gavin was raised in a nuclear family, grew up in the church, got along well with his peers, and maintained stable employment prior to the Illinois murder.  Gavin's mother denied any history of mental health issues on either side of the family.  She stated that the family was exposed to constant street violence, drug activity, and gangs in the neighborhood.

does not find any support for any non-statutory mitigating circumstance.

Thus, the trial court determined that the aggravating circumstances outweighed the non-existent mitigating circumstances, adopted the jury's recommendation, and sentenced Gavin to death for each of the capital counts, to be followed by a consecutive term of life imprisonment for the attempted murder count.

On direct appeal, the Alabama Court of Criminal Appeals affirmed Gavin's conviction and sentence. *Gavin*, 891 So. 2d at 998. The Alabama Supreme Court denied certiorari, *Ex Parte Gavin*, 891 So. 2d 998 (Ala. 2004), as did the United States Supreme Court, *Gavin v. Alabama*, 543 U.S. 1123 (2005).

## C. State Postconviction Proceedings

Subsequently, Gavin filed a state postconviction petition under Alabama Rule of Criminal Procedure 32, arguing, as relevant here, that (1) his trial attorneys were constitutionally ineffective during the penalty phase for failing to obtain and present readily-available mitigating evidence related to his background, "childhood, upbringing, family, socio-economic status, or any other particularized facts that would have humanized Mr. Gavin for the jury"; and (2) the jury committed misconduct when it engaged in premature penalty phase deliberations in violation of Gavin's constitutional right to a fair trial.

The trial court summarily dismissed the premature jury deliberation claim and held an evidentiary hearing on Gavin's ineffective-assistance claim.[11]

Smith, one of Gavin's trial counsels, was deceased at the time of the evidentiary hearing, and Gavin did not call co-counsel Ufford as a witness (although there is no indication that Ufford was unavailable). Instead, Gavin submitted sworn affidavits from Smith and Ufford that they filed in connection with Gavin's post-verdict motion for a new trial in 2000, in which Gavin made similar allegations of ineffective assistance of counsel.

As to the mitigation investigation, Smith attested in his affidavit as follows:

> I initiated contact almost immediately with Lucia Penland of the Alabama Prison Project (APP) to obtain the services of the APP to investigate matters involving mitigation. Due to her commitments in other capital murder cases which were much further along in the trial preparation process, Ms. Penland was unable to commit a great deal of time to this particular case in its early stages. When Ms. Penland was finally able to travel from Montgomery to Centre to meet with [Gavin], to discuss possible preparation of a mitigation case, [Gavin] adamantly refused to discuss mitigation matters, insisting on his innocence

---

[11] The same judge who presided over Gavin's trial and sentencing presided over the Rule 32 proceeding.

and the fact that he was not at the scene of the crime when the shooting took place. He maintained this posture throughout the entire preparation phase of the case. In fact, Ms. Penland, while in Chicago on other business during the summer prior to the trial of the case, attempted to contact Defendant's family for purposes of preparation; they refused to speak with her, apparently because [Gavin] had not authorized them to speak with our defense team. Ultimately, as appellate defense counsel is aware, [Gavin's] mother traveled from Chicago to testify in his behalf in the sentencing portion of the trial, and we obtained the testimony of a local minister with whom the Defendant had established a relationship during his incarceration in Cherokee County. The testimony is a matter of record and I will not attempt to characterize it. However, on more than one occasion, [Gavin's] mother summed up her feelings by noting that it was a shame her son had no money to retain a "real attorney."[12]

Gavin submitted an affidavit from Minister S.J. Johnson. Johnson asserted that Gavin's counsel first approached him to testify three days before the start of the penalty phase. Counsel asked only what Johnson's "impression" of Gavin was and did not

---

[12] Co-counsel Ufford stated simply that he "concur[red]" in Smith's affidavit, and that Smith's affidavit was "an accurate statement of the facts learned and the decision making process used and agreed upon by me during the time of preparation for the trial."

prepare Johnson for testifying.  This short five-minute meeting was Johnson's only meeting with counsel.

Gavin testified at the evidentiary hearing that he was born and raised in the housing projects of Chicago and had 11 siblings (one of whom was deceased).  Gavin's parents were married and both parents lived in the home.  His father was a disciplinarian and "whooped" Gavin when he did something wrong but social services was never involved with his family.  Gavin described his neighborhood as "pretty safe"—his mother would even leave the doors unlocked—but it "started getting bad" when he was "[a]round nine or 10 years old."[13]  Gavin denied being involved with drugs but confirmed that there was drug activity in the neighborhood.

Gavin dropped out of school in the eleventh grade, but later earned his GED and took some college courses while incarcerated for the Illinois murder.  He was incarcerated in the Illinois state prison system from 1982 until December 26, 1997, for murder, and he was paroled at age 37 after serving 17 years of his 34-year sentence.[14]  Upon his release, he returned home to Chicago to live

---

[13] Gavin acknowledged during his testimony that he may have told Dr. King in an interview that things in his neighborhood started changing and getting bad when he was slightly older—around 11 or 12 years' old.

[14] Gavin was convicted in 1982 of the Illinois murder and paroled in December 1997, which is approximately 15 years' imprisonment.  Nevertheless, the parties agree that Gavin served 17 years of his 34-year sentence for the Illinois murder.  Gavin's presentence report indicates that he was arrested in March

with his mother, but he could not find work.  When he returned to his mother's home after his release, "the house was messy, and dirty," and in a state of disrepair.  At the time, his sister Sharon, his sister Geanetta, her husband, and their three children were also living at his mother's house.  Gavin stated he was distressed and depressed with the condition of his mother's home, and he felt like his siblings had let his mother down—he noted that a "couple" of his siblings also had drug issues at that time.

Gavin confirmed that trial counsel hired an investigator to work on his case and that the investigator "worked with" Gavin. However, Gavin did not provide any testimony about the extent of the investigation or his interactions with the investigators.

Lucia Penland, the mitigation specialist, testified that Gavin's counsel Smith contacted her in October 1998, and shortly thereafter, formally retained her services to assist with Gavin's case.  According to Penland, Smith did not provide her with any background materials concerning Gavin's life, and she requested that he obtain Gavin's prison records, but he did not.[15]  Penland

---

1981 for the Illinois murder, and it is possible that Gavin received credit for time served while pending trial in the Illinois case.  In any event, we accept the parties' contention that he served 17 years of his 34-year sentence for Illinois murder before being paroled.

[15] On cross-examination, Penland admitted that John Sturman, another mitigation specialist that she arranged to help with the case, managed to obtain "some records," including Gavin's educational and prison records, but Penland herself never saw those records.

interviewed Gavin in April 1999. During that interview, Gavin provided her with "basic background information, schools he went to, where he lived, . . . whether he had had any medical emergency-type injuries, illnesses, that sort of thing, just basic information, and including information about his family." However, she admitted that Gavin was uncooperative, kept insisting on his innocence, and she "had a difficult time in the initial interview . . . with convincing him to give me any information." Because of Gavin's prior prison sentence for the Illinois murder, Penland spoke with Smith about obtaining an expert on the effects of institutionalization, and Penland contacted Dr. Craig Haney, who was an expert in that field, but Dr. Haney was unavailable at the time of trial. Penland testified that Smith did not contact her between May and September 1999 to check on her progress.

At some point between the April 1999 interview with Gavin and September, Penland attempted to interview Gavin's mother, but she refused to speak with Penland, and the rest of Gavin's family were uncooperative as well. Penland sought the help of fellow mitigation specialist John Sturman who was based in Chicago. Sturman had slightly better luck with Gavin's mother and obtained an interview from her.

In September 1999, Smith informed Penland that Gavin's trial was set for November. Penland told Smith that more work needed to be done, and she requested that Smith get another

20-11271                Opinion of the Court                19

continuance.[16]  According to Penland, Smith "was not willing to ask for a continuance," and "didn't believe that he could get one" because Smith's most recent request for a continuance due to his broken foot was denied.  Approximately two weeks before trial, Penland obtained Sturman's reports and sent them to Smith, again expressing her belief that, because of the family's lack of cooperation, there were potential mitigation leads that remained unexplored and that Smith should seek a continuance.[17]  Smith

---

[16] The record reflects that Smith had obtained at least two prior continuances.

[17] Penland stated the following:

> Bayne, I am forwarding on to you material from Mr. Sturman in Chicago.  There are issues that need to be pursued in this case, including the atmosphere in which Mr. Gavin grew up, the effects of his incarceration, effect of poverty, racism, etc. Mr. Sturman said that during the time Mr. Gavin was growing up and in the area of town where his family lived, there was a great deal of violence, including the development of large gangs, and serious gang activity.  All of these issues along with whatever is found in the family dynamics need to be thoroughly explored.

> I would like to urge you again to request a continuance, based on the information we are developing, along with the lack of cooperation we have encountered, and the time factor on my part—having just this Monday finished with a trial on a prior case—which has not allowed us to be further along than we are at this time.  It is not an unreasonable request under the circumstances.  We need to have time to not only complete the preliminary work, but to engage some expertise to help present to the jury, and the judge, the issues which go to

responded that, although Gavin's family seemed to be "coming around and beginning to cooperate to some extent," Gavin remained unwilling to cooperate, and Smith did not believe that another continuance would be granted based on statements from the trial court. Penland admitted during the evidentiary hearing that Smith did some of his own investigation work, and she was unaware of the extent of his investigation.

Dr. Betty Paramore—a clinical counselor and expert mitigation specialist hired by Gavin's postconviction team to develop a mitigation profile—testified to several risk factors and positive ("protective") factors she identified in Gavin's life following interviews with Gavin and his family.[18] She emphasized that several of Gavin's siblings had drug issues, were involved with gangs, and had a history of incarceration. Dr. Paramore

---

mitigation. An adequate mitigation case can not be developed otherwise.

[18] The risk factors included "multi-generational family dysfunction"; large family size; parental criminality (Gavin's father was incarcerated for nine months for robbery when Gavin was two years old); low-socioeconomic status and poverty; Gavin's exposure to domestic violence and physical abuse as a child (family members reported Gavin's father was "a strong disciplinarian" that gave "whippings" with "extension cords, sticks, hoses, [his] fist, and other items . . . within [his] reach"—although notably Gavin denied any abuse as a child); Gavin's exposure to race riots and racial tension in his neighborhood following the assassination of Dr. Martin Luther King; and exposure to violence, gang activity, and criminal activity. The protective factors included that Gavin had "warm, supportive relationships with [his] parents and other adults."

emphasized that, during Gavin's incarceration in Illinois, Gavin was the victim of gang violence, was stabbed many times, and hospitalized.

Gavin also offered the deposition testimony of Dr. Craig Haney, a social psychologist and professor of psychology. He testified about the effects of institutionalization[19] on individuals generally, and on Gavin specifically. According to Haney, institutionalization causes individuals to "not be able to function adequately" in society because such individuals are accustomed to a heavily structured, regulated environment, where institutions tell them what to do, and once released, the individual has trouble initiating behavior, making plans, and dealing with the freedoms of society. Haney opined that because Gavin was only 22 and still in fundamental stages of development when he entered the Illinois prison system for the first murder, the effect of institutionalization on him was "relatively powerful" and undermined his ability to adjust positively to society once released.[20]

---

[19] Haney defined institutionalization as "the process of change that occurs in people when they are placed in institutional . . . settings." Institutionalization is considered a "social phenomenon" and is not a recognized clinical diagnosis in the Diagnostic and Statistical Manual (DSM).

[20] Haney reviewed Gavin's prison records from the Illinois prison system. During Gavin's 17 years in prison in Illinois, Gavin had only one major disciplinary write-up for a shank being found in his possession, and his other write-ups were for minor infractions, such as listening to his television too loudly. Gavin was transferred 12 times during the 17-year period, and Dr. Haney opined that each transfer increased Gavin's risk of becoming

Finally, Dr. Glen King testified as an expert witness in the area of clinical and forensic psychology on behalf of the State. Gavin reported to Dr. King that (1) he had no history of alcohol or substance abuse issues; (2) "his parents were loving, devoted and good parents"; (3) he denied being physically abused as a child—although when pressed he acknowledged that his father's discipline "maybe bordered on that"; (4) his neighborhood "was relatively safe," especially during the first 12 years of his life—so safe, the family left their door unlocked—but violence in the neighborhood increased when Gavin was a teenager;[21] (5) he told Dr. King that there "wasn't much gang violence" in the neighborhood and that "he was not particularly afraid" of his neighborhood; (6) he reported that his family was very close and denied being poor; and (7) while in the Illinois prison system, he earned his GED and took college courses and vocational training.

Following the evidentiary hearing, the Alabama postconviction court denied Gavin's Rule 32 ineffective-assistance claim on the merits. The Rule 32 court found that counsel was not

"institutionalized." However, Gavin reported that he requested to be transferred each of those 12 times because "it broke up the time for him, [and] made things go a lot faster." The State's expert testified that Gavin's prison records from Illinois revealed that he became "what you might describe almost as a model prisoner and did extremely well."

[21] According to Dr. King, Gavin reported in his interview that "he was not aware of too much violence occurring until he was probably about 16 or 17 when he reported that that was when the drugs started to get heavier in his neighborhood."

deficient for failing to present additional mitigation evidence, concluding that it was Gavin's and his family's fault "for failing or refusing to cooperate with his trial attorneys and the mitigation specialists." Further, the court noted that much of the mitigation information presented would have been unlikely to "humanize" Gavin because it would have portrayed him "as the product of a violent family from a violent, gang ridden, and drug infested Chicago ghetto where the Defendant had previously committed a murder. . . ."

The Alabama Court of Criminal Appeals ("CCA") affirmed the denial of Gavin's petition. With regard to Gavin's ineffective-assistance claim, the CCA, relying on Smith's affidavit from the motion for new trial, emphasized that Smith hired Penland to assist with mitigation almost immediately after taking the case, and that the correspondence between Smith and Penland established that she could not complete her investigation because Gavin and his family were uncooperative. Based on these circumstances, the CCA held that "we are unable to say that the investigative steps taken by Gavin's trial counsel were unreasonable, and the circuit court did not err in denying this claim."

As for prejudice, the CCA reweighed the mitigation evidence from the Rule 32 hearing against that presented at trial and determined that Gavin was not prejudiced by counsel's failure to present this evidence. Specifically, the CCA reasoned as follows:

> The trial court found the existence of three aggravating circumstances: (1) that the capital offense

was committed while Gavin was under a sentence of imprisonment; (2) that Gavin had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person; and (3) that the murder was committed during the course of a robbery in the first degree. Additionally, the trial court found that no statutory mitigating circumstances existed and that there were no nonstatutory mitigating circumstances. The evidence presented at Gavin's Rule 32 evidentiary hearing was to a great extent centered around Gavin's childhood in Chicago and imprisonment and, as the circuit court noted, likely would have been given very little weight by the jury. Thus, we agree . . . that the admission of this evidence would not have changed the verdict in the penalty phase.

Accordingly, Gavin has failed to establish that he was prejudiced by the alleged omission of the above mitigating evidence. We agree with the circuit court that this testimony would have been unlikely to have humanized Gavin with his jury, and the circuit court correctly denied this claim.

As for Gavin's juror misconduct claim, the CCA denied the claim on the merits, concluding that the claim was based on the admission of juror testimony, which would have been inadmissible under Alabama Rule of Evidence 606(b).

### D. Federal § 2254 Habeas Proceeding

Following the denial of state postconviction relief, Gavin filed the underlying § 2254 federal habeas petition, which the district court granted in part and denied in part. The district court held that counsel's performance related to the penalty phase was deficient and prejudicial under *Strickland*, and that the state court's conclusion to the contrary was an objectively unreasonable application of *Strickland*. *Gavin v. Dunn*, 449 F. Supp. 3d 1174, 1245–49 (N.D. Ala. 2020).

As to the question of performance, the district court concluded that "[c]ounsel were totally unprepared for the penalty phase." *Id.* at 1245. The court emphasized that "[c]ounsel's lack of preparation [could not] be excused by the initial failure of Mr. Gavin and his family to cooperate with counsel or Ms. Penland, because Mr. Sturman was able to get mitigating evidence from [Gavin's mother] prior to trial." *Id.* The court noted that, although it had "no insight into counsel's decision not to elicit testimony concerning Mr. Gavin's background from [his mother at trial]," counsel's decision to not do so was "inexplicable." *Id.* at 1245–46. The district court also concluded that Sturman's report "should have raised red flags" for counsel, and that "counsel's failure to follow up on [the red flags] was deficient under *Strickland*." *Id.* at 1246. Accordingly, the court held that

> [t]rial counsel did not conduct an adequate background investigation, did not pursue all reasonably available mitigating evidence, and did not

make a reasonable effort to present the mitigating evidence they had. Mr. Gavin has clearly established that counsel were deficient under *Strickland*. Thus, it follows that the [CCA's] finding to the contrary is objectively unreasonable.

*Id.* at 1246–47.

Turning to the question of prejudice, the district court explained that

> [i]f counsel had presented the evidence Mr. Gavin produced at the Rule 32 hearing, the jury would have heard evidence that Mr. Gavin's parents' families had histories of drug abuse, alcoholism, . . . and incarceration; Mr. Gavin's siblings were gang members with histories of drug use, violence, and incarceration; Mr. Gavin's father Willie, Sr., was physically abusive . . .; and that Mr. Gavin grew up in a gang-infested housing project in Chicago, living in overcrowded houses that were in poor condition, where he was surrounded by drug activity, crime, violence, and riots.

*Id.* at 1247–48. The district court noted that the CCA determined that "this evidence would 'likely have been given very little weight by the jury,'" but the district court disagreed with that finding, citing Supreme Court cases and cases from this Court in which prejudice was found due to the omission of similar mitigating evidence. *Id.* at 1248–49. Accordingly, the district court held that because of the value placed on this type of mitigation evidence in

other cases, the CCA's "contrary finding is an unreasonable application of *Strickland*." *Id.* at 1249.

With regard to the juror misconduct claim, the district court held that the CCA's denial of Gavin's premature jury deliberation claim was neither contrary to, nor an unreasonable application of, clearly established federal law because Gavin failed to show that extrinsic evidence was injected into the jury deliberations and the evidence Gavin offered was "nothing more than prohibited testimony about the debate and deliberations of the jury." *Id.* at 1203–06. The state of Alabama's appeal and Gavin's cross-appeal followed.

## II.    Standard of Review

We review the district court's ruling on a § 2254 habeas petition *de novo*. *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018). Yet the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") also governs this appeal, which establishes a "highly deferential standard for evaluating state-court rulings, [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). Thus, under AEDPA, a federal court's review of a final state habeas decision is greatly circumscribed, and a federal habeas court cannot grant a state petitioner habeas relief on any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

"[C]learly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

For a state-court decision to be "contrary to" clearly established federal law, the state court must have "applie[d] a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Id.* "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). "Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). Rather, the state court's application of federal law "must be 'objectively unreasonable.' This distinction creates 'a substantially higher threshold' for obtaining relief than *de novo* review." *Id.* (quotations omitted); *White v. Woodall*, 572 U.S. 415, 419 (2014) (explaining that, for purposes of § 2254(d)(1), the state court's application of clearly established federal law must be "objectively unreasonable, not merely wrong; even clear error will not suffice" (quotation omitted)). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

A state court's decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Rather, a prisoner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner

bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With these principles in mind, we turn to the claims at issue in this appeal.

## III.    Discussion

### A. Ineffective Assistance During the Penalty Phase

Alabama argues that the state court's determinations that counsel's mitigation efforts were reasonable and that Gavin did not suffer any prejudice was not an objectively unreasonable application of *Strickland*, and that the district court erred in not deferring to the state court's decision as required by § 2254.

A petitioner alleging that he received ineffective assistance of counsel in violation of the Sixth Amendment must establish two elements. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* Review of counsel's actions is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Additionally, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* In other words, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

"Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Prejudice occurs when there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the capital sentence context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397–98).

"[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Renico*, 559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state]

courts have in reaching outcomes in case-by-case determinations.'" (quoting *Yarborough*, 541 U.S. at 664)).

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under § 2254. *Harrington*, 562 U.S. at 101.

> Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different . . . [for] [a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* Accordingly, where, as here, "§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether *there is any reasonable argument that counsel satisfied Strickland's deferential standard*." *Id.* at 105 (emphasis added). Consequently, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.*

### (i) Deficient Performance

With regard to the deficient performance prong, the CCA determined that Smith hired Penland to assist with mitigation almost immediately after taking the case, and that the

correspondence between Smith and Penland established that she could not complete her investigation because Gavin and his family were uncooperative.  Based on these circumstances, the CCA held that "we are unable to say that the investigative steps taken by Gavin's trial counsel were unreasonable, and the circuit court did not err in denying this claim."  The district court, however, concluded that the CCA's finding was an objectively unreasonable application of *Strickland* and its progeny, and that Gavin had established deficient performance.  *Gavin*, 449 F. Supp. 3d at 1245–47.

As explained below, the district court erred in its determination.  The Supreme Court has clearly, and repeatedly, held that counsel's actions must be afforded a presumption of adequacy and "that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant."  *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (quoting *Strickland*, 466 U.S. at 687).  Thus, Gavin must have come forward with sufficient evidence to overcome the presumption, and "the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'"  *Id.* at 23 (alterations in original) (quoting *Strickland*, 466 U.S. at 689).  "In fact, even if there is reason to think that counsel's conduct was far from exemplary, a court still may not grant relief if [t]he record does not reveal that counsel took an approach that no competent lawyer would have chosen."  *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (quotation omitted).  Gavin has

not shown that the state court's determination that counsel's performance was not unreasonable was contrary to, or an unreasonable application of, *Strickland*.

In this case, there is an absence of evidence regarding the full picture of counsel's investigation in preparation for the penalty phase. As an initial matter, we do not have the benefit of counsel's testimony from the evidentiary hearing—Smith was deceased at the time of the Rule 32 hearing and Gavin did not call co-counsel Ufford to testify. We agree that counsel's testimony is not always necessary. *See Reeves*, 141 S. Ct. at 2411–13 (explaining that the defendant's failure to call his attorneys to testify can be, but is not per se, fatal to an ineffective-assistance claim). The petitioner can establish counsel's deficient performance in other ways. And in Gavin's case, he submitted declarations from both counsel that they had submitted in connection with Gavin's motion for a new trial in 2000, affidavits from various individuals, and testimony from several witnesses at the evidentiary hearing, including the mitigation specialist that his counsel had hired to help prepare for the penalty phase.

But the record developed by Gavin does not show that the state court's determination that his counsel's performance was not unreasonable "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Rather, the record shows that Gavin's counsel did, in fact, prepare for the penalty phase. Smith hired mitigation specialist

Penland shortly after his appointment to Gavin's case to help prepare for mitigation. Gavin and his family were consistently uncooperative leading up to the penalty phase. Penland admitted that Smith engaged in his own independent investigation, and she had no knowledge of the details of his investigation. The record corroborates that Smith conducted his own independent investigation. For instance, he hired Dennis Scott, a private investigator; requested and obtained additional funding for Scott's services; and had Scott sit at counsel's table throughout the voir dire and trial proceedings—a clear indicator that Scott played a pivotal role in the defense's preparation. Yet, the record contains no information related to Scott's investigation or counsel Smith's independent investigative efforts. In other words, the record is incomplete concerning Gavin's counsel's investigation.

"*Strickland* specifically commands that a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 563 U.S. at 196 (quotation omitted). An incomplete or ambiguous record concerning counsel's performance—like the record here— is insufficient to overcome the presumption of reasonable performance.[22] *Callahan v. Campbell*, 427 F.3d 897, 933 (11th Cir.

---

[22] Contrary to Gavin's argument in his brief and at oral argument, we do not hold that the record must contain testimony from counsel to establish deficient performance nor do we hold that there is a deceased-trial-counsel exception to *Strickland*. We merely hold, consistent with Supreme Court precedent, that (1) courts are required to presume that counsel acted

2005) ("Because [counsel] passed away before the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of [the defendant's] trial. In a situation like this, we will presume the attorney did what he should have done, and that he exercised reasonable professional judgment." (quotation and footnote omitted)). Accordingly, the state court's determination that, given the circumstances here, it could not conclude "that the investigative steps taken by Gavin's trial counsel were unreasonable" was not an objectively unreasonable application of

---

reasonably, (2) the petitioner bears the burden of overcoming that presumption, and (3) an incomplete or ambiguous record is insufficient to overcome the presumption of reasonableness to which counsel is entitled. Although Smith was deceased at the time of Gavin's Rule 32 evidentiary hearing, there were other ways in which Gavin could have presented a complete picture of counsel's performance. For instance, Gavin could have called co-counsel Ufford, but he did not. Gavin also could have presented evidence related to the efforts undertaken by private investigator Scott—who it is clear from the record played a significant role in Gavin's defense—but he did not. Or Gavin could have presented testimony or affidavits from his mother or any of his eleven siblings detailing what interactions, if any, they had with Gavin's trial counsel, Penland, or Sturman, but again he did not. In short, despite Smith's unavailability, there were numerous other ways in which Gavin could have met his burden of proving the full extent—or lack thereof—of counsel's investigation, but he failed to do so. We note that the aforementioned evidence provides just a few examples of the types of evidence a petitioner can present in support of his ineffective-assistance claim; it is not meant to be a comprehensive list. Nor do we mean to suggest that if a petitioner produces all of this evidence he will necessarily prevail.

*Strickland*, and the district court erred in holding otherwise.[23] *Gavin*, 449 F. Supp. 3d at 1244.

We note that, although the district court cited AEDPA and its deferential principles in its opinion, it did not follow them when considering Gavin's ineffective-assistance claim. Rather than evaluating whether the CCA's determination that counsel's performance was not deficient was contrary to, or an objectively unreasonable application of, *Strickland*—as required by the text of

---

[23] Gavin maintains that we have "relied on similar facts" as those present in his case to find deficient performance in *Evans v. Sec'y, Dep't of Corr.* ("*Evans I*"), 681 F.3d 1241 (11th Cir. 2012); *Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817 (11th Cir. 2018); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991); and *Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985). His reliance on those cases is misplaced. The *Evans* decision he cites was vacated upon our decision to grant rehearing en banc, and on rehearing we did not address the deficiency prong. *See Evans v. Sec'y, Dep't of Corr.* ("*Evans II*"), 703 F.3d 1316, 1325–26 (11th Cir. 2013) (en banc). *Maples* is an unpublished, non-binding authority that is fully distinguishable because the deferential principles of AEDPA did not apply as the state court based its factual conclusions on the wrong Rule 32 petition and "conducted a splintered and fragmented prejudice analysis" which failed to consider the combined prejudicial effects of all of the alleged errors. 729 F. App'x at 821–23. And finally, both *Cunningham* and *Blake* are pre-AEDPA cases involving plenary review of ineffective-assistance claims, and not the deferential framework of AEDPA that we are required to follow now. *See Cunningham*, 928 F.2d at 1016; *Blake*, 758 F.2d at 533; *see also Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 550 (11th Cir. 2015) ("Under pre-AEDPA law . . . a federal habeas court decide[d] questions such as whether habeas relief [was] warranted or whether counsel rendered ineffective assistance—i.e., pure questions of law and mixed questions of law and fact—independently of all prior adjudications.").

§ 2254(d)—the district court turned the inquiry on its head and determined that because in its view "Gavin clearly established that counsel were deficient under *Strickland*," it followed necessarily that the CCA's "finding to the contrary [was] objectively unreasonable." *Gavin*, 449 F. Supp. 3d at 1246–47. In short, the district court failed to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)," and fell into the trap the Supreme Court warned of in *Harrington*. *See Harrington*, 562 U.S. at 105.

To be clear, the *Strickland* inquiry and the § 2254(d) inquiry are distinct inquiries. *Id.* at 101. For purposes of § 2254(d), the state court's application of clearly established federal law "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White*, 572 U.S. at 419 (quotation omitted); *Renico*, 559 U.S. at 773; *see also Hosley v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (explaining that AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents. It goes no farther." (quotation omitted)). The district court erred in examining anew whether counsel's performance fell below *Strickland*'s reasonableness standard and then concluding that because—in the district court's view—counsel's performance fell below that standard, the state court's determination to the contrary was an objectively unreasonable application of *Strickland*.

### (ii) Prejudice

Gavin also failed to demonstrate that the state court's determination that he did not satisfy the prejudice prong was an unreasonable application of *Strickland*. The district court unreasonably rejected the CCA's finding that the mitigation evidence would have been given little weight by the jury, based solely on the fact that the Supreme Court had placed value on similar types of mitigation evidence in other cases. As explained previously, in assessing prejudice under *Strickland* in a capital case, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[24] *Strickland*, 466 U.S. at 695.

---

[24] Gavin's argument that the state court's decision should not receive AEDPA deference because it applied the wrong standard when assessing prejudice lacks merit. In support, he points to the CCA's statement that the omitted mitigation evidence would not have changed the verdict and the fact that the CCA did not mention reasonable probability of a different outcome in its holding. Gavin's argument is incorrect. The CCA explained and applied the proper prejudice analysis, consistent with the standard in *Strickland*. For instance, the CCA explained that "[w]hen claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," which is the test set forth by the Supreme Court. *Strickland*, 466 U.S. at 695. It then applied that test, reweighing the totality of the mitigating evidence against the aggravating circumstances in Gavin's case. Further confirmation that the CCA applied the *Strickland* prejudice standard is that the CCA cited *Wiggins v. Smith*, 539 U.S.

Given that the jury recommended a sentence of death by the narrowest possible vote under Alabama law, 10 to 2, Gavin "need establish only 'a reasonable probability that at least one juror would have struck a different balance' between life and death." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1270 (11th Cir. 2020) (quoting *Wiggins*, 539 U.S. at 537); *see also* n.7, *supra* (discussing Alabama's capital sentencing scheme and that a recommendation of death requires the vote of at least ten jurors).

It was reasonable for the CCA to conclude that counsel's failure to present the mitigation evidence in question was not prejudicial. In assessing the reasonable probability of a different result, the state court's task was to determine whether there was a substantial likelihood that the outcome would have been different by weighing the aggravating evidence and totality of the mitigating evidence—both that adduced at trial and during the habeas proceeding. *Porter*, 558 U.S. at 41; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). At Gavin's sentencing, the trial court concluded that there were no statutory mitigating factors or non-statutory mitigating circumstances present. Thus, the question for the CCA was whether the non-statutory mitigation evidence presented in the postconviction proceedings would have outweighed the following aggravating factors: (1) that Gavin was

---

510 (2003), and its own decision in *Washington v. State*, 95 So. 3d 26 (Ala. Ct. Crim. App. 2012), both of which applied *Strickland*'s standards for assessing prejudice.

previously convicted of another felony involving the use or threat of violence to a person (his prior murder conviction); (2) that Gavin committed the murder during the commission of a robbery; and (3) that he committed the murder while under a sentence of imprisonment for another crime.

At his Rule 32 hearing before the state postconviction court, Gavin presented non-statutory mitigation evidence that largely centered on his childhood and the effects of his previous imprisonment in Illinois. This evidence established that he grew up "in the projects in Chicago," and he was exposed to gang violence and drug activity in the neighborhood and from his siblings. His father was a strong disciplinarian and whipped the children, which Gavin stated may have in hindsight amounted to physical abuse, and there was some testimony that his father abused his mother.[25] Nevertheless, there was also evidence that

---

[25] Gavin argues that the state court unreasonably discounted the evidence of his childhood abuse because of his age and its remoteness in time to the crimes in contravention of *Porter*. Gavin misinterprets *Porter*, in which the Supreme Court held that it was "unreasonable to discount to irrelevance the evidence of [the defendant's] abusive childhood" even though he was 54 years old at the time of the trial. 558 U.S. at 37, 43. Contrary to Gavin's argument, *Porter* did not announce a broad principle that courts may not consider age of the defendant as a factor in assessing the weight to give mitigation evidence. And, in Gavin's case, the CCA did not discount the minimal evidence of childhood abuse to "irrelevance" but instead determined it was entitled to little weight, which was not contrary to, or an unreasonable application of, clearly established federal law.

his family was close, loving, and supportive.  And the testimony concerning the effects of his previous imprisonment for murder was conflicting at best.  For instance, Gavin's expert witness testified that Gavin's prior incarceration undermined his ability to adjust positively to society; that he was transferred twelve times due to safety concerns, with each transfer increasing the risk of institutionalization; and that the Illinois prison system failed Gavin by not offering him various services and vocational training.  On the other hand, the State's expert testified that institutionalization is not a scientifically recognized condition and that Gavin's prison records indicated he was a model prisoner; that Gavin reported that he requested the transfers to break "up the time"; and that Gavin received his GED and took various college and vocational courses

---

Moreover, the mitigating evidence in *Porter* was significantly more compelling than that presented in Gavin's case.  For instance, in *Porter*, the jury never heard about (1) his "heroic military service in two of the most critical—and horrific—battles of the Korean War"; (2) his mental health struggles following the war; (3) his history of childhood abuse—including that his father beat his mother routinely (once so severely that she had to go to the hospital and suffered a miscarriage) and also was violent with the children, especially Porter, and that his father shot a gun at him for coming home late; (4) that Porter was in special education classes and left school at the age of 12 or 13; and (5) that he suffered from brain damage that could result in "impulsive, violent behavior." 558 U.S. at 33–37, 41.  The Supreme Court reasoned that had the jury heard this information there was a reasonable probability that the jury and the sentencing judge would have struck a different balance, particularly because as to one of the murders there was one aggravating factor—that the murder was committed in a cold, calculated, and premeditated manner—that tipped the scales in favor of death.

while in prison.  The Rule 32 postconviction court concluded that the mitigation evidence in question would have been unlikely to "humanize" Gavin because it would have portrayed him "as the product of a violent family from a violent, gang ridden, and drug infested Chicago ghetto where the Defendant had previously committed a murder. . . . [and] would have necessarily emphasized [Gavin's] violent history."  The CCA agreed that the admission of this evidence "would have been unlikely to have humanized Gavin with [the] jury" and would have been entitled to little weight.  In other words, the non-statutory mitigation evidence Gavin presented could have been a double-edged sword.

It was not unreasonable for the state court to conclude that there was not a substantial likelihood that the jury would have concluded that the non-statutory mitigation evidence—which was of limited value and could have been a double-edged sword— would have outweighed the three significant statutory aggravating factors present in this case.  *See, e.g.*, *Jenkins*, 963 F.3d at 1271–73 (holding that state court did not unreasonably apply *Strickland* when it concluded that similar mitigating evidence—some of which was "a double-edged sword"—did not outweigh the significant aggravating factors); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1312–1315 (11th Cir. 2016) (holding that state court's determination that the petitioner failed to demonstrate prejudice was reasonable where the mitigating evidence was of limited value and there were significant aggravating factors); *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc)

(holding that state court reasonably applied *Strickland* when it concluded that the petitioner failed to establish prejudice where the mitigation evidence was a double-edged sword). Gavin failed to show that the state court's determination that he failed to satisfy *Strickland*'s prejudice prong "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

In concluding that the state court's prejudice determination was based on an unreasonable application of *Strickland*, the district court simply analogized Gavin's case to cases in which the Supreme Court and this Court had found similar types of mitigation evidence sufficient to justify relief under *Strickland*, without accounting for any procedural or factual differences between Gavin's case and those cases. But the prejudice inquiry under *Strickland* involves a case-by-case inquiry—simply because prejudice was found after considering similar omitted mitigating evidence in one case is not dispositive of whether prejudice necessarily exists in another.

We also note that in several of the cases on which Gavin relied—*Wiggins*, *Rompilla*, and *Williams*—AEPDA deference did not apply to the prejudice prong. *See Wiggins*, 539 U.S. at 534 (explaining that because the state court never addressed the prejudice prong, the Supreme Court's "review [was] not circumscribed by a state court conclusion with respect to prejudice"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing

the prejudice prong *de novo* because the state court "never reached the issue of prejudice"); *Williams*, 529 U.S. at 391, 395, 398; *see also Pinholster*, 563 U.S. at 202 (explaining that it "did not apply AEDPA deference to the question of prejudice in [*Williams* and *Rompilla*]"). Thus, as the Supreme Court has cautioned, because it "did not apply AEDPA deference to the question of prejudice in those cases," they "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking"—which is the question we must answer in this case. *Pinholster*, 563 U.S. at 202 (emphasis in original).

Furthermore, the mitigation evidence in *Wiggins* was far more compelling than that presented in Gavin's case. For instance, the omitted mitigation evidence in *Wiggins* indicated that Wiggins's mother was an alcoholic who frequently left the children at home alone for days, forcing them to beg for food, eat paint chips and garbage; Wiggins's mother was abusive and beat the children; she also had sex with men in the bed next to her children while they slept; Wiggins was placed in foster care where he suffered physical abuse, sexual molestation, and rape; Wiggins ran away from his foster home at 16 and was homeless living on the streets; and he had diminished mental capacity. 539 U.S. at 516–17, 535. The Supreme Court emphasized on *de novo* review that there was an absence of aggravating factors in Wiggins's background, and thus, there was a reasonable probability that, if the jury had heard all of this compelling mitigation evidence, it would have returned a different sentence. *Id.* at 537–38. Unlike *Wiggins*, the mitigation

evidence in Gavin's case is far less compelling, and he has three significant aggravating statutory factors.

Similarly, the mitigation evidence uncovered in *Rompilla*—that Rompilla grew up in a very abusive environment (his mother drank during the pregnancy, his parents fought each other violently, his father beat his mother, his mother stabbed his father on at least one occasion, his father beat Rompilla with hands, fists, leather straps, belts, and sticks, there were "no expressions of parental love, affection or approval," his father locked Rompilla and a sibling in a small wire dog pen that was filthy and filled with dog excrement); Rompilla was not allowed to have friends or talk on the phone; his childhood home had no heat or indoor plumbing; he and his siblings were not given appropriate clothing; that Rompilla had alcohol issues, schizophrenia and other disorders; and that "Rompilla's IQ was in the mentally retarded range"—was much more powerful than the mitigation evidence present in Gavin's case.  545 U.S. at 391–93.

In short, the balance of aggravating and mitigating factors is significantly different in Gavin's case than in the precedents he cites.  And no Supreme Court precedent applying AEDPA to state-court prejudice determinations compels a different result.  We conclude that the CCA's determination that Gavin failed to establish prejudice "was not so obviously wrong as to be beyond any possibility of fairminded disagreement" and the district court "exceeded its authority" in rejecting the state court's determination.  *Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020)

(quotation omitted).  Accordingly, we reverse the district court's decision.

## B.  Juror Misconduct

In his cross-appeal, Gavin argues that we should affirm the district court's decision granting him a new penalty phase because the jury conducted premature penalty-phase deliberations, in violation of his Sixth and Fourteenth Amendment right to a fair trial by an impartial jury.  Gavin asserts that the jury voted 10-2 to sentence him to death after the guilt phase but before the penalty phase.  In support of this claim, Gavin argued in his habeas petition that the jury foreman informed postconviction counsel that, during the guilt phase deliberations, one of the jurors stated that "if [they] thought that he would vote differently because he and [Gavin] were both black, he wanted them to know that he was going to vote guilty and in favor of the death penalty."  Each of the jurors then wrote down their votes on a piece of paper for both guilt and innocence—the vote was unanimous in favor of guilt and 10 to 2 in favor of death (which was the same vote following the penalty phase).

The CCA denied this claim, concluding that it was based on inadmissible juror testimony about the internal deliberative process, citing Alabama Rule of Evidence 606(b).  The district court denied federal habeas relief on this claim, concluding that the CCA's decision was not contrary to, or an unreasonable application of, federal law.  We agree.

The Sixth and Fourteenth Amendments guarantee every criminal defendant the right to a fair trial by an impartial jury. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976). Thus, the Supreme Court has held that a juror who will automatically vote for the death penalty in every case regardless of "the facts or the trial court's instructions of law" may be challenged for cause, and, if "one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 726, 729 (1992). Gavin argues that in his case "ten jurors" violated *Morgan*. However, Gavin's case does not involve the type of juror at issue in *Morgan*—one who would automatically vote for the death penalty regardless of the evidence or the jury instructions. The jury's premature penalty phase vote did not reflect any agreement or statement among the jurors that no matter what the penalty phase evidence showed that they would automatically vote for the death penalty. Thus, to the extent that Gavin relies on *Morgan*, it does not help him.

Rather, the gravamen of Gavin's claim is that an irregularity occurred during the juror deliberations—the jurors engaged in premature deliberations before the penalty phase—that violated his constitutional right to a fair trial. Gavin, who bears the burden of proving his claim, seeks to present evidence from the jury foreman in support of this claim. Alabama Rule of Evidence 606(b) (the no-impeachment rule) provides that "a juror may not testify in impeachment of the verdict . . . as to any matter or statement occurring during the course of the jury's deliberations or to the

effect of anything upon that or any other juror's mind or emotions as influencing the" juror's decision. Ala. Evid. R. 606(b). "Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes." *Id.*

However, the rule provides that "a juror may testify on the question [of] whether extraneous prejudicial information was properly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.*[26] Additionally, the Supreme Court has held that the no-impeachment rule must yield to juror testimony about racial animus in jury deliberations. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) (analyzing Fed. R. Evid. 606(b)).[27] However, outside of these narrow exceptions, the Supreme Court has rejected attempts to circumvent the no-impeachment rule embodied in Federal Rule 606(b) (and by extension its state

---

[26] Alabama Rule 606(b) is virtually identical to its federal counterpart Federal Rule of Evidence 606(b), which also provides that a juror may testify to extraneous prejudicial information or outside influences on jury. *See* Fed. R. Evid. 606(b).

[27] We acknowledge that *Pena-Rodriguez* was decided after the CCA issued its decision in 2014, and it is not retroactively applicable to cases on collateral review. *Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018). And Gavin does not argue that *Pena-Rodriguez* affords him any relief. Nevertheless, we cite *Pena-Rodriguez* simply to acknowledge the existence of a second type of exception that the Supreme Court has recognized to the no-impeachment rule.

counterparts). *See Tanner v. United States*, 483 U.S. 107, 126–27 (1987) (holding that Federal Rule of Evidence 606(b) prohibited inquiry into alleged juror intoxication during deliberations and that other procedural safeguards in the trial process protected the defendant's Sixth Amendment right to a fair trial); *Warger v. Shauers*, 574 U.S. 40, 44–48 (2014) (holding that federal Rule 606(b) prohibited introduction of evidence that a juror lied during *voir dire*). The Supreme Court emphasized the importance of Rule 606(b) to ensuring "frankness and freedom of discussion" by jurors during deliberation, which would be destroyed if attorneys could later use juror testimony to attack the verdict. *Tanner*, 483 U.S. at 120, 127. The Court also expressed concern that permitting the use of juror testimony to impeach a verdict would undermine the interest in the finality of judgments, the "jurors' willingness to return an unpopular verdict," and trust in the judicial system. *Id.* at 120–21.

The evidence that Gavin seeks to submit in support of his claim does not fall within the ambit of any exceptions to Rule 606(b)—it is not evidence of an external influence on or extraneous prejudicial information that was brought to bear on the jury's decision, or evidence of racial animus. Rather, Gavin seeks to submit a juror's statement about an irregularity in the jury's deliberative process—the exact type of evidence that Alabama's Rule 606(b) excludes. And despite Gavin's argument that, in the context of premature penalty-phase jury deliberations, the no-impeachment rule "must yield" to his Sixth and Fourteenth

Amendment rights to a fair and impartial jury trial, he has identified no clearly established federal law from the Supreme Court in support of that principle. Thus, the CCA's rejection of this claim was not contrary to, or an unreasonable application of, any federal law. *See* 28 U.S.C. § 2254(d)(1).

## IV.    Conclusion

Accordingly, we reverse the district court's grant of habeas relief on Gavin's ineffective-assistance claim. We affirm the denial of Gavin's juror misconduct claim.

**AFFIRMED IN PART AND REVERSED IN PART.**

20-11271                Jordan, J., Concurring                1

JORDAN, Circuit Judge, concurring.

I join Parts I, II, and III.A(ii) of Judge Branch's opinion for the court. Because we conclude in Part III.A(ii) that the prejudice determination of the Alabama Court of Criminal Appeals was reasonable, it is unnecessary to address counsel's performance in Part III.A(i).

With respect to Part III.B, which concerns the juror misconduct claim, I agree with the result, but my reasoning is slightly different. When the ACCA issued its opinion in August of 2014, the Supreme Court had held that Federal Rule of Evidence 606(b) precluded the introduction of evidence that multiple jurors were intoxicated during trial, and in so doing had rejected the defendant's argument that the exclusion of such evidence violated the Sixth Amendment. *See Tanner v. United States*, 483 U.S. 107, 123–26 (1987). And several months after the ACCA's decision, the Supreme Court again affirmed the exclusion of evidence of alleged juror misconduct under Rule 606(b) and again rejected the contention that the exclusion violated the constitutional right to a fair trial. *See Warger v. Shauers*, 574 U.S. 40, 44–51 (2014) (holding inadmissible an affidavit by one juror that another juror had revealed during deliberations that she lied when questioned at *voir dire*). It was not until *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855, 869–70 (2017), that the Supreme Court held that a prohibition on juror impeachment concerning deliberations and the verdict had to give way to evidence that a juror was racially biased against the defendant. Because *Peña-Rodriguez* was decided several years

2                    Jordan, J., Concurring                    20-11271

after the ACCA issued its opinion in Mr. Gavin's case, I cannot say that the ACCA acted unreasonably in 2014 in applying Alabama Rule of Evidence 606(b) to preclude evidence of the jurors' premature sentencing vote.  Given the AEDPA posture of this appeal, I would not opine on whether the rationale of *Peña-Rodriguez* extends to a scenario like the one presented here.